[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 17-10634

_____

D.C. Docket No. 3:15-cr-00060-MCR-1

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

GARY R. TOMEY, II,

Defendant - Appellant.

_____

Appeal from the United States District Court
for the Northern District of Florida

_____

(July 26, 2019)

Before MARTIN, JILL PRYOR and JULIE CARNES, Circuit Judges.

JILL PRYOR, Circuit Judge:

Appellant Gary R. Tomey, II, operated several nonprofit entities that engaged in telemarketing to collect donations for charities.  Solicitors working for the entities called potential donors.  Using a script that Tomey prepared, the solicitors stated that they were volunteers with a local charity raising money to support women and children, all the money raised would be donated to the charity, and the money would stay within the donor's state.  In fact, though, the solicitors were paid employees calling from another state and only a tiny percentage of the money was donated to charities that served women and children.

Tomey was charged with one count of conspiracy to commit mail and wire fraud as well seven counts of mail fraud.  After a nine-day trial, a jury convicted Tomey on all counts.  The district court then sentenced him to 90 months' imprisonment.  On appeal, Tomey raised several challenges, including whether: (1) the government presented sufficient evidence to support his conspiracy conviction; (2) the district court constructively amended the indictment or allowed the government to introduce evidence that resulted in a material variance from the indictment; and (3) the district court improperly considered Tomey's lack of remorse during sentencing.  After a thorough review of the parties' briefs and the record, and with the benefit of oral argument, we affirm Tomey's convictions and sentence.

# I.   BACKGROUND

## A.   Factual Background

This case arises out of Tomey's operation of three charitable organizations—Youth Achievement League ("YAL"), Children and Family Services ("CFS") and Children's Charitable Services ("CCS")—that used telemarketers to solicit donations.  After working for years at for-profit telemarketing businesses, Tomey joined YAL and then founded CFS and CCS.

## A.   Tomey's History in the Telemarking Industry

Tomey first worked in the telemarketing industry for Telcom Enterprises, a for-profit company that engaged in telemarketing to raise money for charities in Mississippi, Indiana, and Ohio.  Charities hired Telcom to call potential donors and in exchange paid Telcom a percentage of the money raised.  Telcom had either its employees or subcontractors make the telemarketing calls.

Tomey began at Telcom as a sales representative, calling potential donors and seeking donations on behalf of charitable organizations.  Tomey rose through the ranks at Telcom and eventually became a regional director.

While working at Telcom, Tomey formed Short Call, a for-profit entity that became a Telcom subcontractor.  Through Short Call, Tomey ran a call center that solicited donations.  By working as a Telcom subcontractor, rather than as an employee, Tomey was able to keep a greater percentage of the donations and

3

effectively received a pay raise.  When Short Call secured a donation, it kept

approximately 38-42% of the money raised, about 15-25% went to the charity, and

Telcom kept the rest.

**B.    Tomey's Activities with YAL**

While operating Short Call, Tomey attended a Telcom conference with

Anthony DiLoreto, another Telcom subcontractor.  DiLoreto shared with Tomey a

new business idea:  to create a nonprofit organization that would solicit

contributions and then donate the proceeds to charities.  Because the fundraising

organization would itself be a charity, solicitors could tell potential donors that all

money raised went to "the charity."  In addition, this operation would allow

DiLoreto to cut out Telcom, meaning that more money could be given to charity

(or, alternatively, be kept by DiLoreto).

In 2006, DiLoreto formed his nonprofit organization, YAL.  DiLoreto

intended for YAL to raise money to be donated to charities that provided after-

school programs and other youth activities.  DiLoreto served as president of YAL

and as the chair of its board.

About a year after YAL was created, Tomey joined YAL as its executive

director and a board member.  With board approval, Tomey expanded YAL's

fundraising operations from Indiana to Ohio and Mississippi.  Tomey had YAL

solicit donations using fictitious names:  in Ohio it was "Ohio Children Services,"

4

and in Mississippi it was "Mississippi Children Services."  We now detail how Children Services operated in each state.

### 1.    Children Services' Operations in Ohio

Tomey expanded YAL's fundraising operations by having YAL fundraise in Ohio as Ohio Children Services.  He had a group of Short Call employees call potential donors in Ohio to solicit donations.  When the solicitors called potential donors, they used a script that Tomey had prepared.  The solicitors told potential donors that the proceeds raised would stay in Ohio and also that 100% of donations went to "the charity."

If a person agreed to donate to Ohio Children Services, Tomey would mail the potential donor a package that included a donation form.  The donation form, created by Tomey, described Ohio Children Services as a charitable organization that assisted children throughout Ohio by sponsoring them in Special Olympics events, donating to foundations that fulfilled the last wishes of terminally ill children, and donating to shelters for abused women and children.  The form also stated that Ohio Children Services hired no fundraisers or professional solicitors and that all fundraising was done by members of the charity, implying that they were unpaid volunteers.  In fact, Ohio Children Services had donated no money to charity, and the solicitors were paid fundraisers.

Because Tomey knew that donors were more likely to give to a local charity, he took steps to make it appear that Ohio Children Services was based in Ohio, even though all fundraising activities occurred in Florida.  The solicitors placed their calls from Florida, but their phone numbers appeared on caller identification systems with Ohio area codes.  When Tomey sent packages to potential donors, he shipped the packages from Florida to a United Parcel Services ("UPS") store in Ohio so that the store could then place the packages in the mail to make it appear that they had been shipped from Ohio.  The donation forms also indicated that Ohio Children Services had an Ohio address and directed donors to mail their contributions to the Ohio address.  In fact, the address was for a UPS mailbox that Tomey had rented.  The UPS store then forwarded any mail to Tomey in Florida.

Shortly after Ohio Children Services began receiving donations in the mail, the United States Postal Service ("USPS") opened an investigation into the entity. An investigator notified Tomey that the USPS was withholding mail addressed to Ohio Children Services while it investigated whether Ohio Children Services was using a fictitious or false name and violating the federal mail fraud statute.  In response, Tomey told the investigator that Ohio Children Services was a legitimate charity that operated under the umbrella of YAL.  Upon learning that Ohio law required YAL to register with the state to solicit donations, Tomey had YAL register with the state and signed the registration documents as YAL's Chief

Financial Officer.  When the USPS investigator contacted YAL to ask about Ohio Children Services, YAL directed the investigator back to Tomey.

The USPS investigator questioned Tomey about statements that Ohio Children Services made to potential donors.  The investigator asked whether anyone at Ohio Children Services was getting paid; Tomey responded that the organization was a volunteer effort, failing to disclose that the solicitors were paid. When the investigator asked whether Ohio Children Services had given money to charities, Tomey admitted that Ohio Children Services had given no money.

The investigation was resolved when Tomey, on behalf of Ohio Children Services, signed a consent agreement with the USPS.  In the agreement, Tomey agreed to "permanently discontinue[] and abandon[]" making statements that Ohio Children Services was a § 501(c)(3) tax deductible charity or that it donated funds to various charitable organizations.  Gov't Ex. 30i, 30l.[1]

## 2.    Children Services' Operations in Mississippi

Tomey also solicited donations for YAL under the fictitious name Mississippi Children Services.  Tomey had Mississippi Children Services operate in much the same way as Ohio Children Services.  Solicitors told potential donors that Mississippi Children Services was a nonprofit organization that funded

---

[1] Citations in the form "Gov't Ex. X" refer to the government's trial exhibits.

charities in Mississippi that worked with victims of children abduction and also donated to women and children's shelters in Mississippi.  As part of the pitch, the solicitors stated that the donations would be used to help children in Mississippi. The solicitors also told potential donors that "100% of your donation goes directly to the charity" and that the organization did not use professional fundraisers. Gov't Ex. 28h.

As in Ohio, if a person agreed to donate, Tomey would mail him a package of materials.  The donation form indicated that Mississippi Children Services was a "[c]hapter of [YAL]."  *Id.*  The form also identified several charities in Mississippi that Mississippi Children Services assisted.  The form emphasized that Mississippi Children Services did not hire any fundraisers or professional solicitors and that all fundraising was "done by members of the charity."  *Id.*  With each mailer, Tomey would include a return envelope with a Mississippi address.  The address was actually for a UPS mailbox that Tomey had rented.  Any mail sent to the address was forwarded to Tomey.

After receiving complaints about Mississippi Children Services, the Mississippi Secretary of State's office opened an investigation.  Because the donation forms stated that Mississippi Children Services was a chapter of YAL, the Secretary of State's examiner sent a letter to DiLoreto, YAL's president, warning

8

that YAL needed to be registered with Mississippi to solicit contributions as Mississippi Children Services.

During the investigation, the examiner spoke to DiLoreto.  DiLoreto told the examiner that YAL (doing business as Mississippi Children Services) had a physical office in Mississippi that was run by Tomey.  In addition, DiLoreto stated that 100% of funds Mississippi Children Services raised were donated to other charities because Mississippi Children Services had no administrative costs.

When the examiner later spoke to Tomey, Tomey admitted that Mississippi Children Services had no office in Mississippi but said that it planned to open one. Tomey provided documentation showing that Mississippi Children Services had received over $10,000 in donations but gave only $1,100 to charity.

In response to the Secretary of State's inquiries, YAL d/b/a Mississippi Children Services registered with the state of Mississippi.  Tomey submitted the organization's registration materials.  In the registration materials, Tomey stated that he and DiLoreto were responsible for distributing funds and maintaining the organization's financial records.  Tomey also indicated that Mississippi Children Services used volunteers, not professionals, to solicit donations.  Tomey stated that neither YAL nor any of its officers, directors, employees, or fundraisers had (1) been enjoined from soliciting, (2) been the subject of any proceeding regarding any solicitation or registration, or (3) entered into a voluntary compliance agreement

9

with any government agency.  Tomey provided this answer even though just a few
months earlier he had entered into a consent agreement to resolve the USPS's
investigation of Ohio Children Services.

Later, when YAL sought to renew its Mississippi registration, the Secretary
of State's office requested additional financial information from Tomey and YAL.
When Tomey failed to provide the requested information, the Secretary of State's
office warned YAL that unless it provided complete information, its registration
would be denied.  DiLoreto responded that YAL would not be renewing its
registration and had ceased conducting business in Mississippi.  DiLoreto
explained that the charity had not been able to raise enough money to continue its
fundraising efforts and blamed Mississippi's registration process as being too
burdensome "for a volunteer based charity."  Gov't Ex. 28p.

## C.    Tomey's Activities with CFS and CCS

Eventually, Tomey started CFS and CCS, his own nonprofit organizations
modeled on YAL.  Tomey started CFS in Florida in December 2008, and CCS in
Mississippi in February 2010.[2]  Like YAL, these organizations were set up as

---

[2] Apparently, Tomey changed the organization's name from Children and Family
Services to Children's Charitable Services in response to complaints that the name could be
confused with states' children and family services agencies.

nonprofit entities that used telemarketing operations to raise money for other charities.

Tomey operated CFS's and CCS's fundraising efforts from Florida in the same way that he operated YAL's.  Tomey again prepared the scripts that the solicitors used and the mailers that were sent to donors.  In phone calls, CFS and CCS solicitors stated (1) they were volunteers, (2) they were calling from an office within the potential donor's state, and (3) 100% of donations would go to helping women and children in the state.

None of these statements was entirely true.  First, the solicitors were paid employees, not volunteers.  Second, the solicitors were located in Milton, Florida, not the potential donor's state.  The solicitors used different organization names in each state; for example, in Alabama they stated that they were from Alabama Children and Family Services and in Mississippi they stated they were from Mississippi Children and Family Services.  In fact, CFS and CCS had no offices outside of Florida.  To make it appear that CFS and CCS were local charities, Tomey again set up UPS mailboxes and had mail forwarded to him in Florida.  Third, although 100% of the donations went to CFS and CCS, which were technically charities, much of the money collected was used to cover overhead costs for the organizations themselves, including employees' salaries, and also to pay for Tomey's expenses.

Just like YAL, CFS and CCS were investigated by government agencies in the states where they operated.  For example, after CFS solicited donations in Arkansas, the Arkansas Attorney General's Office filed a civil complaint against CFS and Tomey.  The complaint alleged that Tomey operated CFS identically to a for-profit fundraising company and that he had created the entity as a nonprofit "to avoid telemarketing regulations concerning charitable solicitations, to deceive customers as to the ultimate use of charitable donations, and ultimately, to enrich himself."  Gov't. Ex. 25i at 4.  The Arkansas Attorney General claimed that CFS violated the law because (1) it was not properly registered to solicit donations in Arkansas, (2) its name was confusingly similar to Arkansas's Division of Children and Family Services, (3) it falsely used an Arkansas address without maintaining an office in the state, and (4) on phone calls and in written materials it falsely represented that 100% of donations went to charity.

Tomey settled the suit by agreeing to a consent decree with the Arkansas Attorney General.  In the consent decree, he admitted that CFS had falsely represented that the funds raised were to be used in Arkansas, the individuals making the telemarketing calls were volunteers, and 100% of funds were to be used for charitable purposes.  Tomey also admitted that CFS had used the "overwhelming majority of funds . . . to pay wages and commissions of the telemarketers" while providing "almost no charitable aid or services."  Gov't Ex.

25l at 5.  The consent decree reflected that although CFS had collected $50,907.50
in donations in Arkansas, only $325 had been donated to charities.  The decree
barred CFS, Tomey, and future ventures that Tomey joined from soliciting
charitable contributions in Arkansas and required Tomey to dissolve CFS
immediately.  CFS and Tomey also were required to pay $50,907.50 in restitution
and a $50,000 penalty.

After entering into the consent decree, CFS ceased operations in Arkansas.
But CFS and/or CCS continued to operate in much the same way in other states,
including Alabama, Indiana, Ohio, Mississippi, and Tennessee.

Eventually, the Federal Bureau of Investigation ("FBI") learned about CFS's
and CCS's fundraising operations and began to investigate.  The FBI interviewed
Eric Eakes, whom Tomey hired to oversee day-to-day operations at CFS and CCS.
After the interview, Eakes told Tomey that the FBI was investigating them for mail
and wire fraud.  Yet Tomey continued to run CFS and CCS without any major
changes.  As part of the investigation, the FBI sent a confidential human source to
work at CCS.  The source was provided scripts confirming that CCS continued to
use the same fundraising tactics.

During the investigation, Tomey agreed to be interviewed by the FBI.  In the
interview, he was asked about the statement in the scripts that 100% of donations
went to "the charity."  He insisted that the statement was accurate because CFS and

13

CCS, which received the donations, were organized as nonprofits.  But he acknowledged that it would have been inaccurate for solicitors to tell potential donors that all money went back to their state.  The FBI also questioned Tomey about the practice of solicitors referring to themselves as volunteers.  Tomey explained that solicitors had called themselves volunteers because "they volunteer to come to work."  Doc. 131-7 at 35.[3]  But he indicated that employees no longer stated that they were volunteers.

## B.    Procedural History

A federal grand jury indicted Tomey, along with Eakes, on one count of conspiracy to commit mail and wire fraud and seven substantive counts of mail fraud.  The indictment alleged that between August 12, 2008 and May 31, 2012, Tomey and Eakes conspired "together and with other persons" to commit mail fraud and wire fraud.  Doc. 1 at 1.  The indictment included a description of the manner and means that Tomey used to operate the scheme, explaining that Tomey operated CFS and CCS and also that he used "other entities as part of the scheme, including [YAL]."  *Id.* at 2.  The indictment also stated that the USPS had issued a cease and desist order against Tomey based on Ohio Children Services' fundraising activities.  Tomey and Eakes pled not guilty.

---

[3] Citations in the form "Doc. #" refer to the numbered entries on the district court docket.

14

### 1.    The Criminal Trial

Over the course of a nine-day jury trial, the government presented evidence about how Tomey operated YAL, CFS, and CCS.  The government introduced evidence about each organization's fundraising practices.  Former employees who solicited donations admitted that they told potential donors that they were volunteers and that 100% of money raised went to children or charity.  In addition, the government called as witnesses dozens of victims who received telemarketing calls.  The victims described how the solicitors told them that 100% of their donations would go to charity; all money raised would be used in their home state; and the solicitors were volunteers, not paid fundraisers.

The government also introduced evidence about the investigations into each entity.  The jury heard testimony from the FBI agent who performed the investigation and had interviewed Tomey and Eakes.  The jury also heard about other agencies' investigations of YAL, CFS, and CCS and the resolution of each investigation.  The jury thus heard about the Arkansas litigation and the consent decree, where Tomey admitted that CFS had made misrepresentations and violated the law.

The government also presented evidence about how much money YAL, CFS, and CCS raised and donated to other charities.  The organizations raised a total of more than $2 million.  But only a small fraction was donated to charities.

The government's evidence indicated that the organizations donated only about $58,000. Tomey asserted that that YAL, CFS, and CCS donated more to charity—approximately $200,000. But even if Tomey's number was accurate, it still meant that YAL, CFS, and CCS donated only about 10% of the money they raised to charity.

The jury also heard how Tomey spent the remaining money that YAL, CFS, and CCS had raised. The government presented evidence that a significant amount of the money went to cover payroll expenses. In addition, Tomey and DiLoreto received significant amounts of money from the entities. CFS, CCS, and YAL transferred over $30,000 to Short Call, Tomey's for-profit business. And the government presented evidence that Tomey spent an additional $100,000 by using debit cards linked to the organizations' bank accounts to cover his meals, gas, hotels, and other expenses. For example, Tomey used the debit cards to pay for meals and bar tabs at Hooters and a local bar called "Mugs & Jugs." In response, Tomey maintained that the expenses were legitimate because he incurred them while having meals or drinks with the organizations' board members, who were his close friends, and discussing the organizations. The evidence also showed that Tomey regularly transferred money from a YAL bank account that he controlled to a YAL account that DiLoreto controlled, sending more than $263,000 to DiLoreto.

16

At the close of the government's case, Tomey orally moved for a judgment of acquittal as to all counts.  The court took the motion under advisement while the trial proceeded.  Tomey called several witnesses and testified in his own defense.  At the close of all evidence, Tomey orally renewed his motion for judgment of acquittal.  The motion was taken under advisement, and the case was submitted to the jury.

During its deliberations, the jury sent the judge a single question:  "Can one Defendant be found guilty on Count [1] and one Defendant found not guilty on Count [1]?"  Doc. 131-8 at 337.  The government argued that the answer was yes.  Because the indictment charged that Tomey and Eakes conspired "together and with other persons," the government asserted, the jury could find a conspiracy between a defendant and an unnamed coconspirator.  Anticipating that the jury might identify DiLoreto as the unindicted coconspirator, the government explained that there was sufficient evidence for the jury to find a conspiracy between Tomey and DiLoreto because DiLoreto:  (1) formed YAL and told Tomey about it; (2) gave Tomey permission to form the fictitious entities under YAL; (3) spoke with the Mississippi Secretary of State's office on behalf of Mississippi Children Services; and (4) represented that Mississippi Children Services had an office in Mississippi and that 100% of the money it raised went to charity.

In answering the jury's question, the district court instructed:

17

> [Y]es, one Defendant can be found guilty and one not guilty on Count
> [1].  However, in order to find either of the Defendants guilty on Count
> [1], you must first find beyond a reasonable doubt that the Defendant
> under consideration conspired with at least one other person to commit
> the offense charged in Count [1].  In order to do so, you must also find
> that the Government proved beyond a reasonable doubt that the other
> person or persons committed the crime of conspiracy charged in Count
> [1] according to all of the elements of conspiracy as contained in your
> instruction.  To the extent you find one Defendant guilty and the other
> not guilty, you must identify on the verdict form next to Count [1] for
> that Defendant the person or persons with whom you have found the
> Defendant conspired to commit the offense charged in Count [1].

Doc. 131-8 at 345.

Based on the jury's question, Tomey renewed his motion for a judgment of acquittal, arguing among other things that there was insufficient evidence of a conspiracy between Tomey and any unnamed party.  The district court took that motion under advisement as to the conspiracy count but denied Tomey's motion as to the remaining counts.

The jury returned a verdict convicting Tomey of all counts but acquitting Eakes of all counts.  Next to the conspiracy count on the verdict form, the jury wrote the names of three individuals with whom Tomey had conspired.  One of those names was DiLoreto.

### 2.    Tomey's Post-Trial Motion

After the trial, Tomey filed a written motion for judgment of acquittal on the conspiracy count, renewing his argument that there was insufficient evidence that

he had conspired with another individual.  The district court denied the motion.

The court explained that the government "presented sufficient evidence during its

case-in-chief from which a rational jury could find that Tomey conspired with at

least one other person, namely, co-defendant Eakes, to commit mail and wire

fraud."  Doc. 103 at 4.  In the alternative, the court determined, "a rational jury

could . . . find that Tomey knowingly and willfully conspired with an unindicted

coconspirator, Anthony DiLoreto, to commit mail and wire fraud."  *Id*. at 9.

### 3.    Sentencing

At the sentencing hearing, the district court calculated Tomey's total offense

level as 29 and his criminal history category as I, which yielded an advisory

Sentencing Guidelines range of 87 to 108 months' imprisonment.  The court then

gave the parties an opportunity to address the factors identified in 18 U.S.C.

§ 3553(a).[4]

---

[4] Under § 3553(a), the district court is required to impose a sentence "sufficient, but not greater than necessary, to comply with the purposes" of the statute.  These purposes include the need to: reflect the seriousness of the offense, promote respect for the law, provide just punishment, deter criminal conduct, protect the public from the defendant's future criminal conduct, and effectively provide the defendant with educational or vocational training, medical care, or other correctional treatment.  18 U.S.C. § 3553(a)(2).  The court must also consider the nature and circumstances of the offense, the history and characteristics of the defendant, the kinds of sentences available, the applicable guideline range, the pertinent policy statements of the Sentencing Commission, the need to avoid unwarranted sentencing disparities, and the need to provide restitution to victims.  *Id.* § 3553(a)(1), (3)-(7).

Tomey asked the court to impose a sentence below the guidelines range.  He chose to allocute during his sentencing and told the court that he had not given the wording of the solicitation scripts "proper attention."  Doc. 128 at 11.  He stated that he had not intended to commit a crime.  He explained that he had been advised by colleagues and his attorney that for engaging in the conduct, at most, he would suffer civil penalties.  If he had been aware that he could be subject to federal charges and taken away from his family, Tomey declared, he never would have engaged in the activity.

The district court imposed a 90-month sentence, which was at the low end of the guidelines range.  In imposing the sentence, the district court indicated that it had considered the nature and seriousness of the offense, Tomey's history and characteristics, the need to promote respect for the law, the need for general and specific deterrence, and the need to avoid unwarranted sentencing disparities.  In addressing the need for deterrence, the court noted that when testifying at trial and speaking at the sentencing, Tomey had characterized the case as being about his failure to properly word scripts.  The district courted stated that it was "troubling . . . that your denials persist even today."  *Id.* at 29.  In imposing the sentence, the court acknowledged that Tomey was not required to admit that what he did was wrong, but the court nonetheless indicated that it was disturbed that Tomey "fail[ed] to show any insight into the wrongfulness of [his] actions."  *Id.* at 29-30.

This is Tomey's appeal.

## II.   ANALYSIS

Tomey raises three arguments on appeal.  First, he contends that the district court erred in denying his motion for a judgment of acquittal because the government presented insufficient evidence to support his conviction on any of the charged crimes.  Second, he argues that he was convicted of a conspiracy crime that was not charged in the indictment because the district court's jury instructions constructively amended the indictment and the evidence that the government presented at trial materially varied from the conspiracy crime charged in the indictment.  Third, he asserts that the district court improperly considered his lack of remorse at sentencing.  We consider each argument in turn.

**A.   The District Court Properly Denied the Motion for Judgment of Acquittal Because There Was Sufficient Evidence to Support Tomey's Convictions.**

Tomey argues that we must reverse his convictions on both the conspiracy count and the substantive mail fraud counts.  We review *de novo* the district court's denial of a judgment of acquittal on sufficiency of evidence grounds, considering the evidence in the light most favorable to the government and drawing all reasonable inferences as well as credibility determinations in the government's favor.  *United States v. Capers*, 708 F.3d 1286, 1296 (11th Cir. 2013).  We may not overturn a jury's verdict "if any reasonable construction of the evidence would

21

have allowed the jury to find the defendant guilty beyond a reasonable doubt." *Id.*
at 1297 (internal quotation marks omitted).  Applying this standard of review, we
conclude that there was sufficient evidence on the conspiracy count as well as the
substantive mail fraud counts.

### 1. The Government Presented Sufficient Evidence to Establish that Tomey and DiLoreto Agreed to Commit Mail and Wire Fraud.

To sustain a conviction for conspiracy to commit mail and wire fraud, the
government must present evidence establishing, beyond a reasonable doubt, that
(1) two or more persons agreed to a common, unlawful plan to commit mail or
wire fraud, (2) the defendant knew of the unlawful plan, and (3) the defendant
voluntarily joined the plan.  *United States v. Martin*, 803 F.3d 581, 588 (11th Cir.
2015); *see* 18 U.S.C. §§ 1341, 1343, 1349.  "Because conspiracies are secretive by
nature, the jury must often rely on inferences from the conduct of the alleged
participants or from circumstantial evidence of a scheme."  *Martin*, 803 F.3d at
588 (internal quotation marks omitted).  But the inferences must be reasonable and
not based on mere speculation.  *Id.* at 587.

Tomey argues that the government failed to prove that he and DiLoreto
agreed to a plan to commit mail or wire fraud because the government presented
no evidence from which a reasonable jury could conclude that "DiLoreto was put
on notice of the alleged unlawful activity and willfully joined in the same."

22

Appellant's Br. at 18.  More specifically, Tomey asserts that there was no evidence that DiLoreto knew that the solicitors who were working for Tomey at Children Services were making misrepresentations to potential donors.

Although there was no direct evidence that Tomey and DiLoreto reached an agreement, there was ample circumstantial evidence that DiLoreto knew about Children Services' fundraising practices, and thus a jury reasonably could infer that Tomey and DiLoreto reached an agreement.  The government presented evidence that DiLoreto was the head of YAL and created the plan to form a telemarketing charity so that solicitors could tell potential donors that 100% of proceeds went to "the charity."  As a YAL board member, DiLoreto also approved Tomey's expansion of YAL's fundraising activities through entities doing business as Children Services.

In addition, the government introduced evidence showing that DiLoreto knew the solicitors working for YAL (under the fictitious name Children Services) were making false statements.  Tomey testified that DiLoreto reviewed the scripts and approved the language in the pitches, including the statement that 100% of donations would go to "the charity."  And a jury could conclude that DiLoreto knew that the 100% statement was false from the evidence showing that Tomey transferred approximately $263,000 of the money that Children Services raised to an account controlled by DiLoreto.

The evidence about DiLoreto's communications with the Mississippi Secretary of State also supports an inference that DiLoreto knew that the solicitors for Children Services were making false statements. When the Mississippi examiner contacted DiLoreto about Children Services' fundraising activity in Mississippi, DiLoreto told the examiner that YAL, operating through the fictitious entity Children Services, had a physical office in Mississippi, 100% of the funds raised by Children Services went to the charity, and Children Services had no administrative costs because YAL was covering all of them. As it turns out, none of these statements was true. A jury reasonably could conclude that DiLoreto made these statements in an attempt to mislead the examiner so that he would not investigate Children Services more closely and uncover the fraud.

The conclusion that DiLoreto conspired with Tomey is also supported by evidence showing that DiLoreto profited from the scheme. Over about an 18-month period, Tomey transferred approximately $263,000 from his YAL account to a YAL account that DiLoreto controlled. A reasonable jury could conclude from this evidence that Tomey was transferring a share of the fruits of the fraudulent scheme to his partner, DiLoreto. True, Tomey testified that the transfers were innocent and were made to cover the cost of the payroll for the employees who engaged in the telemarketing. But a jury, hearing Tomey's words and observing his demeanor, was entitled to discredit the testimony and, indeed, to

believe the opposite of what Tomey said.  *See United States v. Brown*, 53 F.3d 312, 314 (11th Cir. 1995).

Viewing the evidence in the light most favorable to the government and drawing all reasonable inferences in its favor, a jury could find beyond a reasonable doubt that Tomey and DiLoreto conspired to commit mail or wire fraud.  The district court therefore did not err in denying Tomey's motion for a judgment of acquittal as to the conspiracy count.[5]

### 2.  The Government Presented Sufficient Evidence to Establish that Tomey Committed Mail Fraud.

Tomey also challenges his mail fraud conviction.  To establish that Tomey committed mail fraud, the government had to show that he "(1) intentionally participate[d] in a scheme to defraud and (2) use[d] the mails in furtherance of the scheme."  *United States v. Pendergraft*, 297 F.3d 1198, 1208 (11th Cir. 2002). "An intent to defraud may be found when the defendant believed that he could deceive the person to whom he made the material misrepresentation out of money or property of some value."  *United States v. Maxwell*, 579 F.3d 1282, 1301 (11th Cir. 2009) (internal quotation marks omitted).  The government need not produce

---

[5] In its order denying Tomey's motion for judgment of acquittal, the district court found in the alternative that there was sufficient evidence that Tomey had conspired with Eakes.  On appeal, the government concedes that the district court should not have considered whether there was sufficient evidence that Tomey conspired with Eakes in light of the jury's special verdict form, which did not list Eakes as a co-conspirator.  Because we find sufficient evidence that Tomey conspired with DiLoreto, we need not address the district court's alternative theory.

direct evidence of criminal intent but, instead, can rely on circumstantial evidence.
*See id.*

Tomey argues that the district court erred in denying his motion for judgment of acquittal as to the substantive mail fraud counts because the government failed to introduce sufficient evidence that he acted with an intent to defraud.  We disagree—there was overwhelming evidence of his intent.

A jury could find that Tomey acted with an intent to defraud based on the evidence about his acts in designing the scheme.  As the person running the telemarketing fundraising activities for YAL, CFS, and CCS, Tomey participated in creating the scripts and donor forms, which included false statements about (1) where the organizations were located, (2) whether the employees were volunteers, (3) the percentage of money collected that went to the charities, and (4) in which state the money would be used.  In addition, Tomey took other steps to make it appear to potential donors that YAL, CFS, and CCS were local charities operating in the donor's state, even though they were based in Florida.  Tomey would mail a donation package to a UPS store in the donor's home state where it would then be mailed to the donor, making it appear that YAL, CFS, or CCS had mailed the package from within the donor's state.  In addition, Tomey rented UPS mailboxes in each state so that it would appear to donors that they were sending

their contributions to a local office.  In reality, the donations were forwarded to one office in Florida.

In addition, the evidence shows that Tomey personally profited from the scheme.  The government introduced evidence showing that Tomey used money donated to YAL, CFS, and CCS to pay for his personal expenses by charging more than $100,000 for personal expenses such as meals, gas, hotels, and bar tabs.  Although Tomey testified that the expenses were legitimate business expenses, a jury was entitled to disbelieve this testimony and find that he used the donations to pay for his personal expenses.  *See Brown*, 53 F.3d at 314.

There's other evidence that makes the inference that Tomey acted with an intent to defraud even stronger.  When Tomey signed the consent decree with the Arkansas Attorney General, he admitted that CFS's solicitation materials included misrepresentations.  Even after admitting that the materials contained misrepresentations, Tomey continued to have solicitors use the same fundraising practices in other states.  Because Tomey directed solicitors to use scripts that he knew contained misrepresentations, a jury reasonably could find that Tomey intended to defraud.

Tomey nevertheless argues that there was insufficient evidence because he simply followed generally accepted practices in the telemarketing industry.  Although Tomey testified that he followed generally accepted practices and did not

mean to make any misrepresentations, the jury again was entitled to disbelieve his testimony. *See id.* In light of the overwhelming evidence of Tomey's intent, the district court did not err in denying Tomey's motion for a judgment of acquittal with regard to the mail fraud counts.

## B.   There Was Neither a Constructive Amendment of Nor a Material Variance from the Indictment.

Under the Fifth Amendment, a defendant can be convicted only of the crimes charged in the indictment. *United States v. Holt*, 777 F.3d 1234, 1261 (11th Cir. 2015). If the evidence at trial or the court's jury instructions deviate from the allegations in the indictment, a constructive amendment or variance can arise. *Id.* Tomey argues that his conspiracy conviction must be vacated because the district court's instruction on the conspiracy charge constructively amended the indictment and the evidence offered at trial materially varied from the indictment's allegations. We disagree.

### 1.   There Was No Constructive Amendment.

A constructive amendment occurs "when the essential elements of the offense contained in the indictment are altered to broaden the possible bases for conviction beyond what is contained in the indictment." *United States v. Narog*, 372 F.3d 1243, 1247 (11th Cir. 2004) (internal quotation marks omitted). An indictment may be constructively amended by a district court's instructions. *Holt*,

28

777 F.3d at 1261.  "A constructive amendment is *per se* reversible error."  *Id.* (internal quotation marks omitted).

Tomey argues that the district court broadened the possible bases for his conviction of the conspiracy offense when the court told the jury that it could find one defendant (Tomey) guilty of conspiracy but the other defendant (Eakes) not guilty.  Tomey asserts that this instruction improperly broadened the possible bases for his conviction in two ways:  (1) by allowing the jury to find that he conspired with an unnamed individual, even though the indictment alleged only that he conspired with Eakes and (2) by allowing the  jury to find that there was a conspiracy as to YAL when the indictment alleged a conspiracy only to CFS and CCS.  Because Tomey failed to raise the constructive amendment issue in the district court, we review only for plain error.[6]  *See Holt*, 777 F.3d at 1261.  We conclude that Tomey failed to show that the district court committed any error, let alone plain error, because the district court's response to the jury's question did not broaden the possible bases for conviction.

---

[6] We will reverse a conviction under plain error review only if we find "(1) an error (2) that is plain and (3) that has affected the defendant's substantial rights; and if the first three prongs are satisfied, we may exercise discretion to correct the error if (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings."  *United States v. Madden*, 733 F.3d 1314, 1322 (11th Cir. 2013) (alterations adopted) (internal quotation marks omitted).

With respect to Tomey's first argument, no constructive amendment occurred when the court told the jury that it could consider whether Tomey conspired with individuals other than Eakes.  The indictment stated that Tomey and Eakes "conspire[d] . . . together *and with other persons*" to engage in mail and wire fraud.  Doc. 1 at 1 (emphasis added).  Because the indictment expressly alleged that the conspiracy involved Eakes as well as other unidentified individuals, the district court did not broaden the possible bases for conviction when it told the jury that Tomey could be convicted if the jury found that he engaged in a conspiracy with an individual other than Eakes.

Turning to Tomey's second argument, no constructive amendment occurred when the district court gave an answer that permitted the jury to find that Tomey engaged in a conspiracy involving YAL because the indictment alleged that he engaged in a scheme that involved all three nonprofit entities—YAL, CFS, and CCS.  Certainly, the indictment's primary focus was on CFS and CCS.  But the indictment's allegations nonetheless were sufficient to give Tomey notice that the scope of the conspiracy included the operation of YAL.

Three aspects of the indictment put Tomey on notice that the charged conspiracy involved YAL.  First, the manner and means portion of the indictment alleged that Tomey "also incorporated or registered other entities to use as part" of the scheme.  Doc. 1 at 2.  Importantly, the first entity listed in this paragraph was

30

YAL.  Second, the manner and means section mentioned that the USPS had issued

a cease and desist letter against Tomey.  The USPS's investigation arose from

fundraising activities that Tomey undertook through YAL under the fictitious

name Ohio Children Services, so the reference to the USPS investigation indicated

that the charged conspiracy related to YAL.  Third, the time period of the

conspiracy identified in the indictment—August 2008 through May 2012—notified

Tomey that the scheme involved YAL.  At the beginning of this time period,

Tomey had not yet formed either CFS or CCS.  YAL was the only active entity at

the time; the date range thus informed Tomey that the conspiracy involved his

conduct and actions in operating YAL.

Moreover, because the indictment alleged that the fraudulent scheme

extended to YAL, Tomey had notice that DiLoreto was one of the unnamed

coconspirators.  After all, DiLoreto formed YAL, was its president, and served as a

member of its board.  And, as we explained above, DiLoreto was involved in the

fundraising activities that Tomey had YAL perform under the fictitious name

Children Services:  DiLoreto reviewed the scripts that YAL's solicitors used and

responded to the Mississippi examiners who were investigating the fundraising

activities.  Because the indictment both alleged a conspiracy that involved

unnamed co-conspirators and covered the operation of YAL, the court did not

broaden the possible bases for conviction beyond what was contained in the

indictment when it instructed the jury that it could find one defendant (Tomey) guilty of conspiracy, even if they found the other defendant (Eakes) not guilty. *See Narog*, 372 F.3d at 1247.

### 2.     There Was No Material Variance.

A material variance "occurs when the facts proved at trial deviate from the facts contained in the indictment but the essential elements of the offense are the same." *Narog*, 372 F.3d at 1247 (internal quotation marks omitted). "The allegations in the indictment and proof at trial must correspond so that the defendant is properly notified of the charges, enabling him to present a defense" and protecting the defendant against a subsequent prosecution for the same offense. *Holt*, 777 F.3d at 1261. A variance requires reversal "only when the defendant can establish that his rights were substantially prejudiced." *Id.*

Tomey argues that a material variance occurred at trial because he was convicted of conspiring with DiLoreto in connection with the operation of YAL, yet the indictment alleged only that he conspired with Eakes regarding the operation of CFS and CCS. Tomey failed to raise this argument in the district court, however; we therefore review only for plain error. *See United States v. Dennis*, 237 F.3d 1295, 1300 (11th Cir. 2001). We conclude that Tomey failed to demonstrate any error, let alone plain error, because he cannot establish that the evidence introduced at trial varied from the allegations in the indictment. And

even if we assume that there was a material variance, Tomey cannot show that he suffered substantial prejudice as a result.

As an initial matter, Tomey cannot show that a material variance occurred. Tomey's variance argument rests on the premise that the scheme alleged in the indictment was limited to a conspiracy with Eakes that involved only CFS and CCS. Given the limited allegations, Tomey contends, the government deviated from the facts alleged when it introduced evidence showing that he conspired with DiLoreto with respect to the operation of YAL. But the same allegations that put Tomey on notice that the conspiracy involved unnamed individuals and YAL allowed the government to prove the offense by showing that he conspired with DiLoreto in operating YAL.[7]

Even if we assume that there was a material variance, though, Tomey cannot show that he experienced substantial prejudice. To demonstrate substantial prejudice, a defendant must show that (1) "the proof at trial differed so greatly from the charges that [he] was unfairly surprised and was unable to prepare an adequate defense" or (2) there were "so many defendants and separate conspiracies before the jury that there [was] a substantial likelihood that the jury transferred

---

[7] This is true even though the indictment also alleged that Tomey violated the law by conspiring with Eakes in connection with the operation of CFS and CCS. *See United States v. Simpson*, 228 F.3d 1294, 1300 (11th Cir. 2000) (recognizing that when the government charged several means of violating a statute in the conjunctive, a conviction could be obtained with proof of "only one of the means").

proof of one conspiracy to a defendant involved in another." *United States v. Calderon*, 127 F.3d 1314, 1328 (11th Cir. 1997). Tomey argues that he experienced substantial prejudice because he was unfairly surprised and unable to prepare an adequate defense to the government's theory that he conspired with DiLoreto. But we conclude that Tomey had adequate warning such that he was able to prepare an adequate defense.

Tomey had an ample opportunity at trial to present a defense that the government failed to prove that he conspired with DiLoreto as to YAL because he knew about the government's theory prior to trial. Before trial, the government turned over to the defense an exhibit list indicating that it would be introducing exhibits that related solely to YAL—such as the organization's bank records and tax returns. In addition, the government listed exhibits that related to regulators' investigations of Ohio Children Services and Mississippi Children Services, the fictitious names that Tomey used when he engaged in fundraising activities for YAL. The exhibit list thus gave Tomey notice that the government was relying on a theory that the conspiracy extended to YAL. And Tomey's own actions in trial preparation confirm that he understood that the government would be pursuing this theory because Tomey listed DiLoreto as a potential witness, although he ultimately decided not to call him at trial.

At trial Tomey actually presented a defense that he had not conspired with DiLoreto with respect to YAL.  When Tomey testified, he told the jury about his relationship with DiLoreto.  He tried to rebut the government's theory that DiLoreto profited from YAL's operation by testifying that the transfers of money to DiLoreto had an innocent explanation—to reimburse YAL for payroll expenses.  Although the jury ultimately did not believe Tomey's defense, he had fair notice that the crimes charged included that he conspired with DiLoreto and thus had an opportunity to offer a defense.  *See United States v. Glinton*, 154 F.3d 1245, 1252 (11th Cir. 1998) (concluding that there was no prejudice when the defendants were "fairly apprised" of the charged activity and had an opportunity to present a defense to a trial).

## C.   The District Court Was Entitled to Consider Tomey's Lack of Remorse at Sentencing.

Finally, Tomey argues that the district court erred in considering his lack of remorse at sentencing.  We discern no error.

"[T]he familiar abuse-of-discretion standard of review . . . applies to appellate review of sentencing decisions."  *Gall v. United States*, 552 U.S. 38, 46, (2007).  A court abuses its discretion in imposing a sentence if it (1) fails to consider relevant factors that were due significant weight, (2) gives an improper or irrelevant factor significant weight, or (3) commits a clear error of judgment by

balancing the proper factors unreasonably.  *See United States v. Irey*, 612 F.3d 1160, 1189 (11th Cir. 2010) (en banc).  "The party challenging the sentence bears the burden of establishing that the sentence is unreasonable in light of the record and the § 3553(a) factors."  *United States v. Early*, 686 F.3d 1219, 1221 (11th Cir. 2012).  We review *de novo* whether the district court considered an impermissible sentencing factor.  *See United States v. Stanley*, 739 F.3d 633, 652 (11th Cir. 2014).

When a defendant chooses, without pressure from the court, to allocute at his sentencing hearing and repeatedly denies any wrongdoing, the court is permitted to consider the defendant's freely offered statements indicating a lack of remorse.  *See id.*  "Just as a jury weighs a defendant's testimony once he waives his Fifth Amendment privilege at trial, a judge may consider a defendant's freely offered allocution regarding remorse during sentencing."  *Id.*  Here, because Tomey voluntarily addressed the court during trial and at sentencing, the district court did not err when it considered his lack of remorse.

Tomey nonetheless argues that the district court erred under the former Fifth Circuit's decision in *Thomas v. United States*, 368 F.2d 941 (5th Cir. 1961).[8]  In

---

[8]  In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), we adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

*Thomas*, at sentencing the district court told the defendant, who had pled not guilty, that if he "c[a]me clean," the court would take that into account in imposing a sentence. *Id.* at 944. The court also warned the defendant that if he chose not to confess, the court would take that fact into account at sentencing. *Id.* When the defendant continued to assert his innocence, the court imposed the maximum permissible sentence on the defendant. The former Fifth Circuit vacated the sentence, reasoning that the district court abused its discretion by giving "a judicially imposed penalty" for the defendant's exercise of his constitutional rights to assert his innocence and continue with his appeal. *Id.* at 946. But *Thomas* does not apply in the situation here. Unlike in *Thomas*, the district court made no statements indicating that the sentence would depend on whether Tomey chose to address the court. Because Tomey freely and voluntarily chose to address the court during allocution without pressure from the court, the court was permitted to consider the content of Tomey's voluntary statements, including that he had expressed no remorse, in crafting a sentence. *See Stanley*, 739 F.3d at 652-53.

### III.   CONCLUSION

For the reasons set forth above, we affirm the judgment and sentence of the district court.

**AFFIRMED.**

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

ELBERT PARR TUTTLE COURT OF APPEALS BUILDING
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

David J. Smith
Clerk of Court

For rules and forms visit
www.ca11.uscourts.gov

July 26, 2019

MEMORANDUM TO COUNSEL OR PARTIES

Appeal Number: 17-10634-DD
Case Style: USA v. Gary Tomey, II
District Court Docket No: 3:15-cr-00060-MCR-1

**This Court requires all counsel to file documents electronically using the Electronic Case Files ("ECF") system, unless exempted for good cause.** Enclosed is a copy of the court's decision filed today in this appeal. Judgment has this day been entered pursuant to FRAP 36. The court's mandate will issue at a later date in accordance with FRAP 41(b).

The time for filing a petition for rehearing is governed by 11th Cir. R. 40-3, and the time for filing a petition for rehearing en banc is governed by 11th Cir. R. 35-2. Except as otherwise provided by FRAP 25(a) for inmate filings, a petition for rehearing or for rehearing en banc is timely only if received in the clerk's office within the time specified in the rules. Costs are governed by FRAP 39 and 11th Cir.R. 39-1. The timing, format, and content of a motion for attorney's fees and an objection thereto is governed by 11th Cir. R. 39-2 and 39-3.

Please note that a petition for rehearing en banc must include in the Certificate of Interested Persons a complete list of all persons and entities listed on all certificates previously filed by any party in the appeal. See 11th Cir. R. 26.1-1. In addition, a copy of the opinion sought to be reheard must be included in any petition for rehearing or petition for rehearing en banc. See 11th Cir. R. 35-5(k) and 40-1 .

Counsel appointed under the Criminal Justice Act (CJA) must submit a voucher claiming compensation for time spent on the appeal no later than 60 days after either issuance of mandate or filing with the U.S. Supreme Court of a petition for writ of certiorari (whichever is later) via the eVoucher system. Please contact the CJA Team at (404) 335-6167 or cja_evoucher@ca11.uscourts.gov for questions regarding CJA vouchers or the eVoucher system.

For questions concerning the issuance of the decision of this court, please call the number referenced in the signature block below. For all other questions, please call Bradly Wallace Holland, DD at 404-335-6181.

Sincerely,

DAVID J. SMITH, Clerk of Court

Reply to: Jeff R. Patch
Phone #: 404-335-6151

OPIN-1 Ntc of Issuance of Opinion